LOTTINGER, Judge.
This is a workmen’s compensation proceeding wherein the plaintiff seeks benefits for total permanent disability arising out of an accident which occurred on December 19, 1956, subject to a credit for compensation payments made from that date to January 16, 1958. The lower court held that the accident had caused disability, but only for a period of approximately four months, and, as the compensation payments extended over a greater period of time, denied the plaintiff’s demands. He has appealed.
The following facts are undisputed. While employed as a night watchman at Seadrift, Texas, plaintiff fell on his back across a plank used as a seat in a small boat. He was unable to move for a few moments and was then picked up by a fellow employee. He was immediately taken to a hospital at Port Lavaca, Texas, where he. was attended by Dr. York Lancaster. X-rays were taken by Dr. C. U. Bickford of Victoria, Texas.
Within twenty-four hours of his admission to the hospital Duet was discharged. He returned to his home in Thibodaux, Louisiana, and on December 24, 1956, consulted his family physician and general practitioner, Dr. T. W. Kleinpeter. The latter diagnosed his injuries as lumbo-sacral strain and pain. As plaintiff seemed to be suffering severe pain in his lower back which could not be relieved by injections, Dr. Kleinpeter had him hospitalized for a period of fifteen days, eight of which were spent in traction. Duet was fitted with a brace and after his discharge was, from time to time, given physiotherapy, massage and heat treatments.
As he continued to complain of pain, Dr. Kleinpeter referred Duet to Dr. O. L. Pol-lingue, orthopedic surgeon' of New Orleans, who examined him on February 22, 1957, April 10, 1957 and March 2, 1959. Duet was also examined on September 10, 1957, by Dr. Irving Cahen and on March 7, 1958, by Dr. Blaise Salatich. Both of the latter specialize in the field of orthopedics.
Dr. Pollingue, though called by plaintiff, gave the following testimony:
“A. * * * I would not think that he had what you might call an acute flare-up of the arthritic condition; it is more of a chronic affair.
* * * * H* *
“Q. Actually, though, you did describe in fair detail the fact that this man had a degenerative condition in his back, manifested by probable disk damage, and also very severe arthritic changes, isn’t that a fair description of it? A. It is.
“Q. Now, you do not know Doctor, do you, the severity of the alleged accident on the job? A. No sir.
“Q. And is it not true you did not find in your examination or in your review of the X-rays and your full study of the matter, any so-called bony pathology that you could directly relate to this injury? A. That is correct.
“Q. And you did say, didn’t you, in this particular case you found no evi *489 dence of any acute aggravation of his arthritic condition? A. That is right.
“Q. And, Doctor, the discussion you had on direct examination with respect to the nerve root pressure — In your direct examination you testified concerning nerve root damage in Mr. Duet’s back: did you consider that nerve root damage to be the source of his complaints of pain? A. Either damage or pressure on the nerve, but that is part of his complaint.
“Q. What else is there? A. His postural condition, his arthritic condition, that would probably cover the situation.
“Q. With respect to the nerve root damage or pressure, am I right that you do not know which at the moment? A. That is right.
“Q. Am I also right that that is also explainable on the basis of the degenerative condition of his spine? A. Yes.
“Q. And am I right that that is of long years standing? A. Yes.”
Dr. ICleinpeter, though likewise a witness for the plaintiff, testified as follows:
“Q. Specifically, it is my position that Mr. Duet’s complaints are strictly related to his arthritis. Is it your opinion that he is still suffering adverse effects from the fall which he had in December 1956, over tzvo years ago? A. In my opinion, Mr. Duet at this present time is suffering-from the arthritic condition. Chronic arthritic condition. (Emphasis supplied)
if: ?]c í{í ijc
“Q. Appparently in this case Mr. Duet had a pre-existing condition of arthritis in his spine. A. According to the X-rays evidence of arthritis of his spine, it was of long duration.
“Q. Assuming that for a number of years prior to this injury Mr. Duet was working putting in a full day’s work, sometimes overtime, up to this time when he was injured in Texas by this fall, would you not state that this, fall where he fell in the boat across the seat on his back aggravated this arthritic condition that caused the pain he is complaining of now? A. It is possible that it aggravated it at the time of the injury and for a certain time following the injury, but it is my opinion that the result of the injury zvould not have aggravated it for a period of — what is it? — two years?
“Q. A little better than two years now. A. A little better than two years.
“Q. The fact that the man did not complain of any back injury prior to this fall, would not that indicate that although he had an arthritic condition in his back that it was not causing him any pain until he received this trauma ? A. That is difficult to say. With the amount of arthritic changes that was present in the lower spine, it is inconceivable to understand why the man may not have had pain at some time or another while those severe changes were taking place. It may not have been to a severe degree, but changes of that nature do not usually take place without a certain amount of discomfort.” (Emphasis supplied:)
Dr. Salatich, testifying on behalf of the plaintiff, stated that the latter had sustained a:
“ * * * severe crushing type low back injury, involving a ruptured in-tervertebral disk of the lumbosacral interspace, subsided, with residual dis-function and low back pain.
“My opinion was that this cooperative and apparently sincere 58 year old white male had sustained a jjuite painful, serious and persistently' disabling low back injury, while working in late December, 1956, stemming from a com *490 bined direct crushing and torsion type trauma, exerted over the lumbosacral zone.
“He presents sufficient subjective and objective symptomatology to warrant an indication of an intervertebral disk injury at the lumbosacral level, embracing a rupture and herniation of the nucleus pulposus.
“I though it was quite possible he also sustained rather significant injury of the ligamentous and musculofacial structures overlying and adjacent to the lumbosacral articulation at the time of this accident impact.
“I though the only outstanding clinical finding not demonstrated in this case, involving a radiation of this back pain into the lower extremities, presents almost complete fulfillment of a ruptured intervertebral disk criteria, although he presents sufficient clinical findings to rather convincingly indicate such a low back injury, and the rather marked narrowing of the lumbosacral interspace further substantiates such an opinion and is quite conclusive of lumbosacral intervertebral disk pathology.”
Dr. Cahen, whose testimony was taken on behalf of defendant, testified as follows:
“Q. As a result of your examination and review of the X-rays made, considering the history and the subjective complaints given you by Mr. Duet, did you reach an orthopedic evaluation of this man? A. As a result of the clinical history as given by this patient, the orthopedic evaluation, correlated with X-rays studies, I indicated the type of injury had probably involved contusion of his back with the effect of ligamentous strain, and I believe his original condition was that of impaction of tjie vertebral zone associated with the effect of ligamentous strain. It was my impression from that type of history and the experience with similar cases this man had had acute phases which had received treatment and at some time with the treatment within a period of several months the acute manifestations of this type of trauma appeared to have subsided, and that the effect of the trauma I assumed to have occurred had cleared. However, the patient presented certain other findings which I believed could correlate his persistent subjective abnormality. I indicated in my report it would be important to review earlier X-ray studies to determine any change in his osteo-sis or bony picture from the time of the original injury to the examination by me, in order to determining whether the injury had caused any advancement in the actual bony abnormality which the X-ray studies revealed. I indicated this patient had a pre-existing arthrosis of the spine; that his general habitus was such that with this arthrosis he would be expected to complain of fatigue and discomfort in the back with excessive physical activity; that the type of pathology in consideration of his age group would be solely progressive under ordinary circumstances, and sooner or later the advancement of these degenerative changes would offer more restriction to his activity. Also it was my opinion from his general reaction that the patent was apprehensive regarding the status of his back; and I indicated in my report that I did not believe his changes were to a degree which would prevent his returning to his occupation as a watchman, since he had been capable of performing that activity with the same degree of arthrosis I had noted. I concluded that I would review X-ray studies made earlier in order to confirm my impression that the arthrosis preexisted the injury, and that beyond that effect I had no orthopedic treatment to offer this individual in so far as the injuries of December, 1956, and that upon that basis he could return to his occupation.
*491 “Q. Did you make any specific findings with respect to the presence or absence of soft tissue response on your examination? A. Well, I had indicated in my report that in any case in which injuries have occurred it is expected that certain soft tissue changes should exist if the acute manifestations of the trauma had been persistent. In my report I did not find any soft tissue changes I would accept as being indicative of any complications, and accordingly stated I believe his acute manifestations which occurred originally had cleared.
******
“Q. Did you subsequently have the opportunity to review X-ray studies of Mr. Duet made at the Calhoun County Memorial Hospital, Port Lavaca, Texas, December 20, 1956.? A. Yes.
“What did the X-ray studies reveal by way of comparison with the later X-rays in September, 1957, made by Doctor Teitelbaum? A. The X-rays referred to me for review showed the lumbar zone and pelvic area of this individual. These X-rays presented the same degree of degenerative arthrosis and ligamentous calcification and osteo-plytic bridging I noted on the X-rays by Doctor Teitelbaum. Therefore these X-rays confirmed my impression * * * that this patient had a preexisting arthrosis, and that there had been no change in the over-all appearance of the spine between the two dates I had noted in my report. These X-rays revealed the lower part of the dorsal spine in which there had been considerable ligamental reaction, and this reaction was similarly noted on the plates by Doctor Teitelbaum.
“Q. Ligamental reaction to what? A. To the arthrosis and degenerative changes that had been present.
* * * * * *
“To sum up this case, I would state this man had an injury which I assume to have occurred, which involved liga-mental stress and a contusion of his back; that he had an acute period of disability, in which treatment was rendered; that the acute period of disability subsided with such treatment; and by the time I saw him I found no evidence of acute disability due to injury. And I would sum up the facts to state this man does have over-all arthrosis of his vertebral zone; that he represents an age group associated with arthrosis that makes him less adaptable to excessive physical work than an individual who is normal and younger; but that in his degree of arthrosis I do not consider his disability so great that he could not work in the type of occupation he described to me.”
The deposition of Dr. Lancaster was taken on behalf of defendant. This doctor stated that his examination (made just after the occurrence of the accident) revealed muscle spasms and tenderness in the lumbar area but that otherwise the examination was within normal limits. He did not find any bruises. X-rays were taken at his direction which revealed “a considerable amount of degenerative arthritic changes in the lumbo sacral articulation and in the L-5 and S-l vertebral bodies”. The doctor’s diagnosis was “of minor contusion and sprain of the lumbo-sacral area as the final diagnosis as far as the injury is concerned and the secondary diagnosis of degenerative arthritis of the low lumber vertebrae”.
Dr. Bickford testified that he took and read the X-rays referred to by Dr. Lancaster. He likewise found an arthritic condition of long standing unrelated to the accident.
With the above before him the trial judge concluded:
“The testimony of five of the six doctors who examined Duet leaves no doubt that Duet is suffering with hy-pertrophic, or degenerative, arthritis of the spine and has been so suffering *492 for: iriany yeary; that that type of arthritis is not caused by trauma, or an accident; that in Duet’s case his accident .did not accelerate the progress of the disease and that whatever injury Duet received from the accident has long ago healed.
“Duet’s disability, if any, is therefore not attributable to his accident. He is thérefore not entitled to be awarded workmen’s compensation for total and permanent disability.”
The findings and conclusions of the trial judge lare substantiated by the testimony set, forth above. The decision appealed from is'correct and will, therefore, be affirmed.
'Judgment affirmed.